

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00290-CR

Jose Miguel Garcia **VILLARREAL**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 12, Bexar County, Texas
Trial Court No. 364138
Honorable Scott Roberts, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:      Karen Angelini, Justice
              Rebeca C. Martinez, Justice
              Patricia O. Alvarez, Justice

Delivered and Filed:  August 17, 2016

AFFIRMED

Jose Miguel Garcia Villarreal appeals his conviction for driving while intoxicated, asserting multiple issues on appeal. We overrule Villarreal's issues and affirm the trial court's judgment.

### BACKGROUND

Villarreal was charged by information with the misdemeanor offense of driving while intoxicated on or about June 11, 2011. TEX. PENAL CODE ANN. § 49.04(a), (b) (West Supp. 2015). He pled not guilty and proceeded to trial before a jury. Before trial, Villarreal filed a general

motion to suppress all evidence stemming from the stop, and specific motions to suppress the blood test results and the videotape of the stop. The trial court denied the motions after an evidentiary hearing. After a three-day trial, the jury found Villarreal guilty of DWI and the court sentenced him to confinement for six months in the county jail and assessed a $700 fine. His sentence was suspended and he was placed on community supervision for a period of one year. Villarreal now appeals, arguing that the trial court erred in denying his motions to suppress, granting a continuance for the State, and admitting testimonial and documentary evidence concerning his blood alcohol content (BAC).

## MOTION TO SUPPRESS

In two issues, Villarreal argues the trial court erred in denying his motions to suppress all evidence stemming from the stop of his vehicle because (1) the officer lacked reasonable suspicion to conduct a traffic stop, and (2) the officer was not exercising his community caretaking function when he stopped the vehicle. The State acknowledges in its brief that the community caretaking function is not at issue. Therefore, we need only address Villarreal's argument that the officer did not have reasonable suspicion for the traffic stop.

### *Standard of Review*

In reviewing the trial court's ruling on a motion to suppress, we afford almost total deference to the court's determination of historical facts, especially when it is based on assessment of a witness's credibility, as long as the fact findings are supported by the record. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We apply the same deferential standard when reviewing the court's ruling on mixed questions of law and fact where resolution of those issues turns on an evaluation of credibility. *Johnson*, 414 S.W.3d at 192. We review de novo the trial court's application of the law to the facts and its resolution of mixed questions of law and fact that do not depend upon credibility

assessments. *Id.*; *Wade v. State*, 422 S.W.3d 661, 669 (Tex. Crim. App. 2013) (question of whether a certain set of historical facts constitutes reasonable suspicion for a detention is reviewed de novo). When, as here, the trial court makes express findings of fact, we view the evidence in the light most favorable to the court's ruling and determine only whether the evidence supports the fact findings. *Johnson*, 414 S.W.3d at 192; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

### *Applicable Law*

An officer may conduct a brief investigative detention, or *Terry* stop, when he has reasonable suspicion to believe that the person is involved in criminal activity. *Ornelas v. United States*, 517 U.S. 690, 693 (1996); *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). Reasonable suspicion exists when the officer has specific articulable facts that, combined with the rational inferences from those facts, lead him reasonably to conclude that the person is, has been, or soon will be engaged in criminal activity. *Balentine*, 71 S.W.3d at 768; *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). This is an objective standard that disregards the actual subjective intent of the officer, and instead looks to the totality of the circumstances and focuses on whether there was an objectively justifiable basis for the detention. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). A traffic violation committed in the presence of an officer authorizes an initial stop. *State v. Daniel*, 446 S.W.3d 809, 813 (Tex. App.—San Antonio 2014, no pet.) (citing *Walter v. State*, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000)).

### *Evidence*

The evidence presented at the suppression hearing consisted of the testimony of San Antonio Police Officer Jason Portillo and a defense witness, Benjamin Salinas, the passenger in Villarreal's vehicle, along with the video recording from Officer Portillo's patrol car and two

photographs of the area. Officer Portillo testified that on the night of June 11, 2011, he was patrolling the area near the intersection of Highway 281 and Highway 1604. At approximately 2:15 a.m., Portillo was in his patrol vehicle traveling westbound on the access road of Highway 1604. Traffic was moderate because the nightclubs were closing and people were going home. Portillo first noticed Villarreal's vehicle traveling southbound on Stone Oak toward the 1604 access road when he heard "the brakes locking and the tires screeching" and saw the vehicle approaching the right turn at a high rate of speed. Portillo testified that the right turn from Stone Oak onto the westbound 1604 access road is a "sharp curve, about a 45-degree angle" and there is a yield sign. Portillo testified that, in his experience, the sound of screeching tires means the driver was traveling at a high rate of speed and lost control, and has slammed on the brakes to regain control of the vehicle. When Portillo turned to look for the source of the sound, he saw Villarreal's vehicle exhibiting a "jerking motion where it's stopping, trying to stop at a rapid pace," and "the vehicle was shaking as when you apply the brakes hard." Portillo stated that Villarreal "almost wrecked out" and almost hit the yield sign as he navigated the curve of the right-hand turn at a high rate of speed. Portillo stated there was a vehicle in front of Villarreal's vehicle, and it took the right-hand turn at a slower speed, which was more appropriate for the curve. Officer Portillo testified he did not clock Villarreal's speed, but based on his observation of the high-speed manner in which Villarreal's vehicle took the curve in comparison to the controlled manner in which the vehicle in front made the turn, Portillo opined that Villarreal did not navigate the turn in a reasonable manner.

Portillo's patrol car was equipped with a front-view camera and a back-view camera. Due to the positioning of his patrol vehicle on the access road, Portillo testified that neither of the cameras captured Villarreal slamming on the brakes or his vehicle jerking, but only show him regaining control and traveling at a high rate of speed around the turn. The video was viewed by

the trial court. The video shows Villarreal's vehicle making the last part of the turn and then entering on to 1604, traveling westbound, where the traffic was heavy. Officer Portillo caught up and followed behind Villarreal's vehicle until it exited on Rogers Ranch Road. Portillo then initiated a traffic stop for Villarreal's failure to make the right-hand turn on to the 1604 access road in a reasonable and prudent manner.

Benjamin Salinas testified that he was a long-time friend of Villarreal and was with him on the night of June 11, 2011. Salinas and Villarreal had been at a nightclub on Stone Oak for approximately two hours and left just before closing time at 2:00 a.m. Salinas testified he saw Villarreal drink two beers, but they were not together the entire time at the club. Villarreal was driving and Salinas was in the front passenger seat when they left and began driving southbound on Stone Oak toward 1604. Salinas testified that Villarreal was not speeding, did not lose control, and did not almost hit a pole or curb when he navigated the right-hand turn on to the westbound 1604 access road. Salinas also stated there was no yield sign at the turn. On re-direct, Officer Portillo reiterated that he was positive there was a yield sign at the turn, and explained that he diagrammed it on the wrong side and it was actually on the outside curb of the turn, rather than on the inside curb. Portillo further stated that, in his experience and training, there are usually yield signs at those types of curves "[t]o let them know to slow down so they can negotiate the curve safely."

At the conclusion of the hearing, the trial court made the following findings of fact on the record: (1) the officer began following Villarreal at Stone Oak and followed him until he finally stopped him somewhere off Rogers Ranch; (2) the officer was a credible witness; (3) the officer stated under oath that he "heard a screeching of the tires, that he observed [Villarreal's] vehicle taking the curve from Stone Oak Parkway onto the access road of 1604 at a too-high rate of speed and that he almost struck a yield sign;" (4) the yield sign is clearly present on the video; (5) it is

unclear from the video whether the yield sign was almost struck; and (6) the officer followed Villarreal "for quite a long distance before he made the stop, however, the officer testified that he did this for personal safety reasons." Based on these facts, the trial court concluded that Officer Portillo had reasonable suspicion to make the traffic stop and proceed with an investigation.

*Analysis*

On appeal, Villarreal argues the State failed to prove that Officer Portillo had reasonable suspicion for the traffic stop because "the officer . . . testified at the motion to suppress that, at the time of the stop, he did not believe [Villarreal] was intoxicated, tired, or sleepy," and "he did not believe [Villarreal] committed an offense given the manner in which [he] handled the curve at Stone Oak and 1604." Villarreal mischaracterizes the officer's testimony. The record shows that Officer Portillo answered "No" when asked by defense counsel, "Now, at this time when you're going behind him, you - - the only reason to believe that an offense may have been committed . . . is the noise you heard and you saw the defendant coming out of the curve. Is that fair to say?" Officer Portillo also answered "No" when defense counsel asked, "So at the time you followed the defendant for five minutes that you did not bother to stop him or pull him over despite the fact that he got into a highway with heavy traffic, the only thing you had in your mind was a hunch and nothing else. Is that fair to say?" Officer Portillo never stated at the hearing that "he did not believe [Villarreal] committed an offense given the manner in which [he] handled the curve at Stone Oak and 1604." With respect to his subjective belief whether Villarreal was intoxicated, tired, or sleepy, Officer Portillo's testimony was that, at the time he heard the noise, saw Villarreal, and got behind his vehicle, he did not suspect that Villarreal was intoxicated, tired, or sleepy.

Further, in reviewing the trial court's ruling on a motion to suppress, we apply an objective "reasonable man" standard that disregards the actual subjective intent of the officer. *Derichsweiler*, 348 S.W.3d at 914. Looking at the totality of the circumstances, we focus on

whether there was an objectively justifiable basis for the temporary detention. *Id.* Here, Officer Portillo not only testified to his opinion that Villarreal "did not navigate the turn in a reasonable and prudent manner," but also articulated specific, objective facts based on his personal observations of Villarreal's operation of his vehicle which, along with rational inferences flowing from those facts, created a reasonable suspicion that Villarreal had committed a traffic violation. *See* TEX. TRANSP. CODE ANN. § 545.351(c)(2) (West Supp. 2015) (operator shall, consistent with subsections (a) and (b), drive at an appropriate reduced speed if approaching and going around a curve); *see also id.* § 545.351(a) (operator may not drive at a speed greater than is reasonable and prudent under the circumstances); *id.* § 545.351(b) (operator may not drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard for actual and potential hazards). Officer Portillo testified to his specific observations that: (i) he heard "brakes locking and tires screeching;" (ii) when he turned to look for the source of the noise, he saw Villarreal's vehicle approaching the turn at a high rate of speed; (iii) he saw the vehicle jerking and shaking "as when you apply the brakes hard;" (iv) the right turn from Stone Oak on to the westbound 1604 access road is a "sharp curve, about a 45-degree angle" and there is a yield sign; (v) he saw Villarreal's vehicle make the right-turn at a rate of speed "too high" for the type of curve; and (vi) he saw the vehicle almost hit the pole of the yield sign when it went around the curve. Portillo also testified that, in his experience and training, the sound of screeching tires means the driver was traveling at a high speed, lost control, and has slammed on the brakes to regain control of the vehicle. *See Ford v. State*, 158 S.W.3d 488, 494 (Tex. Crim. App. 2005) (law enforcement officer's training and experience are factors that can be considered in a reasonable suspicion analysis).

Villarreal points out Officer Portillo's failure to recognize the intersection in defense photos, Salinas's testimony stating that Villarreal was not speeding and there was no yield sign at

the intersection, and the discrepancies between the officer's testimony and his report. However, such inconsistencies or conflicts in the evidence are for the trial court to resolve in its role as fact-finder. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Based on his personal observation of the high-speed manner in which Villarreal's vehicle took the curve—"almost wrecking out," and his comparison to the controlled manner in which the vehicle in front made the turn, Officer Portillo stated that Villarreal did not navigate the turn in a reasonable manner. The officer articulated specific facts that establish reasonable suspicion that Villarreal committed a traffic offense under section 545.351 of the Transportation Code. The trial court's fact findings are supported by the record and it did not abuse its discretion in denying Villarreal's motions to suppress.[1]

## MOTION FOR CONTINUANCE

In his third issue, Villarreal argues the trial court abused its discretion when it granted the State's oral motion for continuance of the April 2, 2014 trial setting based on the need to obtain an English translation of statements made in Spanish on the video of the stop. The verbal request for continuance does not appear in the record. The only reference to the challenged continuance is at the beginning of the April 2, 2014 reporter's record of the suppression hearing that was held that day. The trial court briefly states, "Yesterday we were prepared to start the trial, pick a jury this

---

[1] Relying on *State v. Dixon*, 151 S.W.3d 271 (Tex. App.—Texarkana 2004), *aff'd*, 206 S.W.3d 587 (Tex. Crim. App. 2006), Villarreal also argues the approximately five-minute delay between Officer Portillo's observation of the traffic violation and his stop of the vehicle undermines any reasonable suspicion that may have existed. The court of appeals' opinion in *Dixon* focuses on the trial court's finding that the 3.2 mile delay between the officer's observation of the un-signaled turn and the traffic stop was unreasonable. *Id.* at 274-75. However, the opinion stresses that the trial court made a finding that nothing prevented the officer from conducting the stop sooner, and clarifies that it is not holding that a 3.2 mile delay would be unreasonable in every case. *Id.* at 275. Here, Officer Portillo testified that Villarreal's vehicle had already entered into "heavy traffic" on 1604 by the time Portillo got behind him and he waited to stop Villarreal until he exited the highway for reasons of "officer safety." This case is therefore distinguishable from the situation in *Dixon*. We also note that the Court of Criminal Appeals held that the dispositive issue in *Dixon* was not the delay between the purported traffic offense and the officer's traffic stop, but rather was the trial court's determination that no traffic offense was in fact committed. *See Dixon*, 206 S.W.3d at 590-91.

morning, and then it was brought to my attention that the videotape of the stop contained a lot of Spanish in it and it had not yet been translated, and that needed to be done prior to introducing it to the jury, so I decided that we were going to have to, at least, reset for a while to give that a chance to happen." Defense counsel then referenced a previous conversation off the record, and re-stated Villarreal's opposition to the continuance because "the case being pending on the docket for about three years . . . there was plenty of time for the Government to secure the translation of the video." The State replied that it was "not opposed to a continuance," stating that it is "in the best interest of both parties that . . . in order to make a complete record that we get everything translated into English." The trial court then reiterated its decision to re-set the trial and proceeded with the suppression hearing. The court's docket sheet shows there were two subsequent continuances granted on Villarreal's request before the case finally proceeded to trial on April 7, 2015.

On appeal, Villarreal asserts the April 2, 2014 continuance was an abuse of discretion because the State ultimately did not use the translation at trial and he suffered actual prejudice because the continuance deprived him of a speedy trial.[2] The State replies that Villarreal challenged the accuracy of the translation and, because the translator was no longer employed by Bexar County and was unavailable to testify, it therefore could not use the transcript. A trial court has discretion to grant an oral motion for continuance based on "equitable grounds." *Williams v. State*, 172 S.W.3d 730, 733 (Tex. App.—Fort Worth 2005, pet. ref'd). "[A] motion for continuance, based on equitable grounds rather than on statutory grounds, is entirely within the

---

[2] Villarreal argues he was prejudiced by the continuance because it violated his right to a speedy trial. Villarreal's objection to the continuance did not make any reference to his right to a speedy trial, and the record does not show that he ever asserted his right to a speedy trial, either before or after April 2, 2014. *See Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008) (defendant bears the burden to assert his right to a speedy trial). Indeed, the court's docket sheet shows two continuances were granted at Villarreal's request after April 2, 2014.

sound discretion of the court, and will only call for reversal if it is shown that the court clearly abused its discretion." *Id.* (quoting *Alvarado v. State*, 818 S.W.2d 100, 103 (Tex. App.—San Antonio 1991, no pet.)). To obtain a reversal based on the trial court's decision to grant a continuance, an appellant must show actual prejudice arising from the continuance. *Williams*, 172 S.W.3d at 733 (citing *Vasquez v. State*, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002)).

Given the sparse record surrounding the oral motion for continuance, we cannot say the trial court abused its discretion in granting the continuance based on the State's presentation of a legitimate need for additional time to obtain a translation of statements it claims it intended to use at trial. Apart from Villarreal's insinuation of bad faith by the State, there is nothing in the record to suggest the State was not truthful about its intent to use the translated statements at trial. Moreover, we conduct an abuse of discretion review based only on the information known to the trial court at the time of its ruling, not based on what subsequently occurred at trial. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). We conclude the trial court did not abuse its discretion in granting the continuance.

## EVIDENTIARY ISSUES

In his final two issues, Villarreal asserts the trial court erred in permitting Officer Portillo to testify at trial to a "correlation" between Villarreal's performance on a field sobriety test and his BAC level, and erred in admitting the BAC report. We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).

### Officer's Testimony Regarding Field Sobriety Test

Villarreal asserts that Officer Portillo was allowed to give improper trial testimony by correlating Villarreal's performance on the walk-and-turn field sobriety test to his particular BAC level. *See Emerson v. State*, 880 S.W.2d 759, 768-69 (Tex. Crim. App. 1994) (concluding the

Horizontal Gaze Nystagmus, or HGN, test is a reliable indicator of intoxication, but also concluding the test is not a sufficiently reliable indicator of "a precise BAC"). Extending *Emerson* to a different type of field sobriety test, Villarreal contends the officer's testimony that Villarreal's "clues on the walk-and-turn field sobriety test indicated that [his] blood-alcohol concentration was over .08" constituted an improper quantification of his precise BAC. The State challenges Villarreal's characterization of the officer's testimony, and asserts Portillo merely testified to the number of clues exhibited by Villarreal on the walk-and-turn test and the number of clues necessary to indicate intoxication, and drew no correlation between the clues and a precise BAC level.

The record shows that Officer Portillo testified about his administration of several standardized field sobriety tests and to the number of clues indicating intoxication that Villarreal exhibited on each test. Villarreal's complaint on appeal is limited to the officer's testimony about his performance on the walk-and-turn field sobriety test. After detailing the instructions he gave Villarreal for the walk-and-turn test, Officer Portillo described his observations of Villarreal's performance on the test. Portillo testified that Villarreal exhibited four clues of intoxication on the walk-and-turn test by failing to keep his balance during the instructions, stepping off the line during the test, raising his arms for balance during the test, and taking too many steps during the test. The State then asked Officer Portillo, "And how many clues - what's the minimum number that indicates that a person's blood-alcohol concentration is over .08?" Over defense counsel's objection, Portillo was permitted to answer, "Two clues."

In *Emerson*, the court held that, "[a] witness qualified as an expert on the administration and technique of the HGN test may testify concerning a defendant's performance on the HGN test, but may not correlate the defendant's performance on the HGN test to a precise BAC." *Id.* at 769. We disagree that Officer Portillo's testimony correlated Villarreal's performance on the walk-and-

turn field test to his precise BAC level. Portillo merely testified that the presence of two out of four clues on the walk-and-turn field sobriety test indicates that a person is intoxicated, i.e., over the legal limit. The fact that the prosecutor's question referred to intoxication in terms of the legal limit of a "blood-alcohol concentration over .08" does not mean that the officer's answer was an attempt to quantify Villarreal's precise BAC. In discussing the proper scope of an officer's testimony concerning the HGN test, the *Emerson* court held that the defendant's performance on the test is admissible as evidence that the defendant was intoxicated, just not as to the defendant's exact BAC level. *Id.* at 769. Officer Portillo's testimony did not violate *Emerson*.

### Admission of BAC Report

Last, Villarreal asserts the trial court erred in admitting the lab report showing his BAC results because the State failed to establish a proper chain of custody to prove the blood tested was drawn from him. The nurse who drew Villarreal's blood samples was deceased at the time of trial and did not testify. Officer Portillo testified that he observed the nurse draw the blood samples from Villarreal, shake the vials ten times, label and seal the vials in an envelope, and place them in a locked refrigerator. He stated that only the medical examiner can remove the blood vials from the locked refrigerator. Portillo also testified that the labels used by the nurse were "[t]he stickers that we write their name, case number, my name, and my badge number, the nurse's name and, I guess, the time and date." Finally, Officer Portillo stated that he looked at and checked the vials. He also filled out a blood draw checklist about the procedure.

Dr. Vanessa Hargrove, the Chief Toxicologist at the Bexar County Medical Examiner's Office, testified that she received two blood vials for testing in this case with Villarreal's name and date of birth. She identified State's Exhibit No. 8 as the one-page BAC report she prepared and signed on July 12, 2011. Dr. Hargrove testified that the report lists Villarreal's full name and shows the vials were received at the lab on June 16, 2011. When asked about the condition of the

blood vials, Dr. Hargrove stated that she had no notes otherwise, so they "came in intact as they should." Dr. Hargrove testified that she analyzed the blood using gas chromatography to determine its blood alcohol content. When the State moved to admit the BAC report, Villarreal raised several objections, including that the chain of custody had not been established because it did not show "what happened to the vials after the blood was drawn." The trial court overruled the objection and admitted the report. Dr. Hargrove then testified that the report showed Villarreal had a BAC level of 0.12.

Villarreal argues on appeal that the trial court abused its discretion in admitting the BAC report because a proper chain of custody was not established. Specifically, Villarreal asserts that because Officer Portillo did not testify that he saw what the nurse wrote on the vials' labels, and was not himself shown the blood vials for identification at trial, the chain of custody was insufficient to prove that the blood tested was the same blood drawn from him. A proper chain of custody must be established to lay the predicate for admission of blood test results. *Mitchell v. State*, 419 S.W.3d 655, 660 (Tex. App.—San Antonio 2013, pet. ref'd). The State must prove that the blood drawn from the defendant was the same blood that was received at the laboratory. *Id.* It is only necessary for the State to prove the beginning and end of the chain of custody to support admission of the evidence, "particularly when the chain ends at a laboratory." *Id.* at 559-60; *see Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989); *see also Durrett v. State*, 36 S.W.3d 205, 208 (Tex. App.——Houston [14th Dist.] 2001, no pet.). Absent any evidence of fraud or tampering, any gaps in the chain of custody go to the weight of the evidence, not its admissibility. *Mitchell*, 419 S.W.3d at 660; *Druery v. State*, 225 S.W.3d 491, 503-04 (Tex. Crim. App. 2007). Finally, it is not necessary that the nurse who drew the blood testify if an officer who observed the nurse conduct the blood-draw can testify that the proper procedure was followed. *Durrett*, 36

S.W.3d at 210-11; *State v. Guzman*, 439 S.W.3d 482, 488-89 (Tex. App.—San Antonio 2014, no pet.).

Here, Officer Portillo's testimony was sufficient to establish the beginning of the chain of custody for the blood samples. He witnessed the nurse draw the blood from Villarreal, described the procedures she followed and how she labeled the vials, checked the vials himself, and saw the nurse seal the vials in an envelope and place it in a locked refrigerator with access restricted to the medical examiner's office. *See Mitchell*, 419 S.W.3d at 660. Likewise, Dr. Hargrove's testimony sufficiently established the end of the chain of custody at the laboratory when she testified that on June 16, 2011 she received the blood vials for testing in Villarreal's case, his name and date of birth were on the form, her notes did not indicate the blood vials were not intact, and she analyzed those blood samples for their alcohol content and signed the report. *See id.* The trial court therefore did not abuse its discretion in admitting the blood test results showing Villarreal's BAC level.

## CONCLUSION

Based on the foregoing reasons, we overrule Villarreal's issues on appeal and affirm the trial court's judgment.

Rebeca C. Martinez, Justice

DO NOT PUBLISH